IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

SAVANNAH DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR 416-305 |
| | ) | |
| DEMONT HERMAN TODD | ) | |

_____

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
_____

Charged with production and possession of child pornography, and enticing a minor to produce pornography, Defendant Demont Herman Todd moves to suppress evidence from the search and seizure of his cell phone and statements made after his arrest. (Doc. no. 39, p. 1.) Upon consideration of the briefs and testimony at the hearing on January 12, 2017, the Court **REPORTS** and **RECOMMENDS** Defendant's motion to suppress be **GRANTED** as to suppression of post-arrest statements and **DENIED** as to suppression of evidence from the search and seizure of the cell phone. (Doc. nos. 39, 42.) All related motions should be **DENIED** as moot. (Doc. nos. 28, 34.)

## I.    FACTS

### A.    Informant Allegations and First Interview of Defendant

On October 8, 2015, FBI Agent Kathia Jackson Meade met with an underage female runaway, in custody for shoplifting, to discuss her allegations of child trafficking and abuse by Defendant. (Court's recording system, *For The Record*, (hereinafter "FTR"), 11:10:15 – 11:11:10.) The minor informed Agent Meade that she and "LP," another underage female, began living with Defendant at his grandfather's apartment when they were fifteen years

old.  (FTR 11:11:00 – 11:11:30.)  Defendant allegedly assaulted LP and forced her to perform commercial sex acts.  (FTR 11:11:40 – 11:12:00.)  Through backpage.com, Defendant posted photos of LP and arranged for her to have sex with clients.  (FTR 11:12:10 – 11:12:30.)  The minor alleged LP had sexual relations with Defendant since the age of seven.  (FTR 11:12:10 – 11:12:30.)

The next week, on October 14, 2015, Agent Meade and Savannah-Chatham police officers went to the apartment of Defendant's grandfather looking for LP.  (FTR 11:13:20 – 11:13:37.)  Defendant's grandfather stated he was unsure if LP was in the apartment and consented to a search.  (FTR 11:14:40 – 11:15:10.)  Defendant was inside and professed ignorance as to LP's whereabouts.  (FTR 11:15:10 – 11:15:25.)  Officers found LP inside a bedroom closet.  (FTR 11:15:17 – 11:15:36.)  She identified herself as Jessica, and Defendant identified her separately by this same false name.  (FTR 11:15:37 – 11:16:05.)  LP eventually admitted she was LP, and officers arrested her based on an outstanding probation warrant and a new charge of obstruction by providing a false name.  (FTR 11:16:12 – 11:16:45.)  Officers also arrested and charged Defendant with obstruction for lying to conceal LP's location and identity.  (FTR 11:16:45 – 11:17:00.)

### B.      LP's Interview and Flight from Custody

During an interview with Agent Meade the next day, October 15, 2015, LP said she had known Defendant since she was seven years old and had a close relationship with him.  (FTR 11:17:20 – 11:17:40.)  LP denied prostitution, sexual contact with Defendant, and abuse.  (FTR 11:17:40 – 11:18:00.)  However, LP stated she believed the informant minor was involved in commercial sex acts.  (FTR 11:18:00 – 11:18:15.)  After this interview, Agent Meade continued investigating Defendant by conducting interviews, contacting

hotels, and issuing subpoenas to backpage.com. (FTR 11:18:20 – 11:21:50.) On December 18, 2015, LP was released to her mother's custody on the condition that she wear an ankle monitor. (Doc. no. 39-2, "Ex. B," p. 14.) On January 9, 2016, LP cut off her ankle monitor and fled from home. (Id.; FTR 9:53:40 – 9:53:47.)

### C. Second Interview of Defendant, Along with Search and Seizure of His Cell Phone

#### 1. Testimony of Officers Cogswell and Rowan

On January 11, 2016, U.S. Marshal Task Force Officer Chase Cogswell called Agent Meade for information as to LP's whereabouts, explaining LP was a material witness in a state homicide and had an active warrant for failure to appear in court. (FTR 11:22:10 – 11:22:45.) Agent Meade stated LP might be at the apartment of Defendant's grandfather. (FTR 11:22:58 – 11:23:40.) That same day, Officer Cogswell and FBI Task Force Officer Mike Rowan went to the apartment, and Defendant's grandfather consented to a search. (FTR 9:55:05 – 9:56:05.) Unable to find LP, the officers asked for Defendant, and the grandfather directed them to apartment 117 on the floor above. (FTR 9:56:00 – 9:56:25.)

Defendant answered the officers' knock on the door of apartment 117. (FTR 9:56:40 – 9:56:50.) Officer Cogswell testified he told Defendant he was looking for LP because of an arrest warrant, and Defendant responded that he "had not spoken to her, had no idea where she was . . . [and] was adamant he had no contact with her." (FTR 9:57:00 – 9:58:00.) Officer Rowan similarly testified Defendant responded by stating he had not spoken to LP "recently" and did not know where she was. (FTR 9:33:24 – 9:33:30.)

During the interview, Defendant was casually examining his cell phone. (FTR 9:58:55 – 9:59:20.) Officer Cogswell testified he asked Defendant if he could look through

the phone to "make sure he hadn't had any contact with [LP]." (FTR 9:59:17 – 9:59:31.) Officer Rowan similarly testified Officer Cogswell asked Defendant if he could "look in [Defendant's] phone to make sure that she hasn't made contact with you." (FTR 9:19:25 – 9:19:40.) Officer Cogswell testified Defendant told him he could look at the phone and "handed it to me." (FTR 10:00:00 – 10:00:36.) Officer Rowan did not recall specifically Defendant's response, but testified it was "something to the effect, sure, you can look in the phone, and he . . . handed the phone over." (FTR 9:20:30 – 9:20:56; 9:22:50 – 9:23:00.) Both officers testified Defendant did not place any restrictions on the scope of the search. (FTR 9:20:30 – 9:20:56; 9:22:50 – 9:23:00; 10:00:00 – 10:00:36.)

Officer Cogswell discovered on the phone's call log that Defendant called LP the day before, on January 10, 2016, which was the day after LP severed her ankle monitor and fled. (FTR 10:03:45 – 10:04:05.) Officer Cogswell saw numerous text messages between Defendant and LP, exchanged only hours before the interview with Defendant, including a message from Defendant telling LP to "stay low," and LP's reply urging Defendant to cease communications in the event Defendant's phone was tapped. (Gov't. Exs. 3, 4; FTR 10:02:30 – 10:03:10.) Officer Cogswell also found nude images on Defendant's cell phone but could not determine if the images were of LP. (FTR 10:03:10 – 10:03:22.) Officer Cogswell testified he confronted Defendant, and Defendant's demeanor changed. (FTR 10:04:18 – 10:04:25.) Defendant "came clean immediately" and "told the truth, which was the opposite of what he told before" by admitting he had contact with LP since she fled her mother's custody. (FTR 9:39:18 – 9:39:30; 10:04:20 – 10:04:50.)

Officer Cogswell asked Defendant to send LP a text message to assist in her apprehension, and Defendant complied. (FTR 10:04:55 – 10:05:10.) Officer Cogswell

seized the cell phone to: (1) prevent Defendant from warning LP that authorities were looking for her; and (2) preserve evidence of the crime Defendant committed by lying about his recent contact with LP. (FTR 10:05:20 – 10:05:36; 10:16:15 – 10:16:55.) As to the latter reason, the officers did not arrest Defendant that day, and they never pursued charges against Defendant for lying to them. (FTR 9:41:00 – 9:41:30.) Officer Rowan testified Officer Cogswell told Defendant he would return the phone, but did not recall when Officer Cogswell said he would return it. (FTR 9:40:50 – 9:41:02.) Officer Cogswell did not recall if he told Defendant he would return the cell phone. (FTR 10:15:19 – 10:15:30.)

Officer Rowan asked the residents of apartment 117 if he could search the apartment for LP and they consented. (FTR 9:19:40 – 9:19:52; 9:22:30 – 9:22:50.) The officers did not find LP in the apartment, but they did find her in Rincon, Georgia that same night. (FTR 11:23:40 – 11:24:10.)

### 2. Affidavit of Defendant and Testimony of Danielle Manker

Defendant gave the following affidavit summary of the cell phone search and seizure. On January 11, 2016, Defendant was with friends at apartment 117 when his grandfather called to say officers were looking for LP and wanted to speak with him. (Doc. no. 39-4, "Ex. D," p. 1, ¶ 2.) When Defendant opened the door to go downstairs, officers were standing outside the apartment. (Id. ¶ 3.) Officer Cogswell told Defendant he was looking for LP, Defendant said he did not know where she was, and Officer Cogswell told the other officers to search the apartment. (Id.)

Officer Cogswell grabbed Defendant's phone without his permission, searched and found text messages with LP, and accused Defendant of lying. (Id. ¶ 4.) At Officer Cogswell's direction, Defendant sent a text message to LP asking if she was okay. (Id.)

5

After LP responded, Officer Cogswell took Defendant's phone so they could track down LP, promising Defendant they would return the phone later that night. (Id. ¶ 5.) Defendant never gave Officer Cogswell consent to look through his phone or to seize it. (Id. ¶ 6.)

Ms. Danielle Manker, a friend of Defendant and resident of apartment 117, testified she first noticed the officers as they walked into the apartment with Defendant, who was talking on the phone. (FTR 12:00:40 – 12:00:55.) Ms. Manker consented to a search of the apartment for LP. (FTR 11:59:20 – 11:59:45.) The officers handcuffed Defendant in the living room and took him outside. (FTR 11:59:20 – 11:59:40.) Ms. Manker did not see the officers take Defendant's phone, but she did observe Defendant was unhappy and protesting. (FTR 12:00:07 – 12:00:36.) Ms. Manker admitted she was smoking marijuana when the officers arrived. (FTR 12:01:20 – 12:02:02.)

**D.    Search of Defendant's Cell Phone SD Card on January 12, 2016**

On the same day as the seizure, January 11, 2016, Officer Cogswell called Agent Meade to explain he had seen nude female images on the phone and ask what to do with the phone. (FTR 11:24:10 – 11:24:40.) Agent Meade gave Officer Cogswell the phone number of Defendant's parole officer, Mr. John Prince. (FTR 11:24:10 – 11:24:40.) On October 15, 2014, Defendant was paroled on burglary and theft convictions, and as a condition of parole, Defendant had agreed his "parole officer or any other parole officer may, at any time, conduct a warrantless search of [Defendant's] person, papers, and place of residence, automobile, or any other property under [Defendant's] control." (Doc. no. 39-7, "Ex. G," p. 2.)

On that same evening of January 11, 2016, in order to comply with a parole condition that he notify his parole officer of any contact with law enforcement, Defendant called

6

Officer Prince and described his encounter earlier that day with Officers Cogswell and Rowan. (FTR 10:32:10 – 10:32:45.) According to Officer Prince, Defendant explained he gave the officers his cell phone voluntarily to assist in the search for LP because he did not want any trouble from law enforcement. (FTR 10:32:10 – 10:32:45.)

The next day, January 12, 2016, Agent Meade called Officer Prince to summarize the events of the day before, including Officer Cogswell's seizure of the cell phone. (FTR 10:32:50 – 10:33:00.) Desiring to search the phone, Officer Prince retrieved it from Officer Cogswell. (FTR 10:33:05 – 10:33:15.) Officer Prince was unable to search the phone because it was turned off. (FTR 10:33:35 – 10:33:42.) Officer Prince believed the cell phone's SD card was searchable but did not have the resources in his office to conduct the search. (FTR 10:33:42 – 10:33:47.)

Officer Prince took the phone to the FBI office in Savannah, where he met with Agent Meade, and she confirmed the FBI had the capability to unlock, download, and review any information on the cell phone and the SD card. (FTR 11:40:35 – 11:40:40.) Officer Prince and Agent Meade conducted a quick search of the cell phone's SD card and uncovered numerous nude images of LP, including graphic images of LP performing oral sex. (FTR 10:34:31 – 10:34:58.) Agent Meade contacted Assistant U.S. Attorney Tania Groover and stopped searching the device based on her advice to do so. (FTR 11:54:35 – 11:54:50.) Based on the images uncovered, Officer Prince determined Defendant had violated the conditions of his parole. (FTR 10:35:05 – 10:35:32.)

### E. Defendant's Arrest for Parole Violation on January 13, 2016

On January 13, 2016, Agent Meade and Officer Prince, along with three other officers, arrived at Defendant's apartment to execute a parole revocation warrant for

possession of child pornography. (FTR 10:36:05 – 10:36:30.) Officer Prince found Defendant at apartment 117, and took him downstairs. (FTR 10:37:20 – 10:37:56.) Officer Prince asked Defendant for the swipe pattern password to his cell phone, and Defendant resisted and began behaving erratically. (FTR 10:39:56 – 10:40:30.) An officer handcuffed Defendant and prompted him for the swipe pattern again. (FTR 10:39:30 – 10:39:40.) An officer removed one handcuff, Defendant provided the swipe pattern, and the officer reapplied the handcuff. (FTR 10:40:55 – 10:41:10.) The officers arrested Defendant and took him to the Chatham County jail. (FTR 10:55:30 – 10:55:40.) Defendant was not Mirandized. (FTR 10:38:40 – 10:38:45; 10:56:15 – 10:56:26.)

During transport, Defendant complained his Fourth Amendment rights had been violated. (FTR 10:55:30 – 10:55:50.) At the jail, Officer Prince asked Defendant if he had any drug paraphernalia, and Defendant eventually admitted he had a small amount of marijuana in his shoe, which Officer Prince removed. (FTR 10:56:15 – 10:56:26.) Defendant was not Mirandized prior to questioning at the Chatham County jail. (FTR 10:56:40 – 10:57:00.)

On February 16, 2016, Officer Prince met with Defendant at the Chatham County jail and explained the parole revocation process. (FTR 10:57:15 – 10:57:51.) Officer Prince provided Defendant with a signed waiver of final hearing, and Defendant read the waiver in its entirety and signed it. (FTR 10:57:00 – 10:57:22.) Defendant was not Mirandized. (FTR 10:57:20 – 10:57:57.)

## F. The Search Warrant

Agent Meade executed an affidavit in support of a search warrant for Defendant's cell phone on January 19, 2016. (Ex. B, p. 10; FTR 11:43:21 – 11:43:50.) On February 8,

2016, the search warrant was presented and executed by U.S. Magistrate Judge G. R. Smith. (FTR 11:49:40 – 11:49:55.) The search of the phone provided a comprehensive report of Defendant's contact information, text messages, call logs, and chats. (FTR 11:42:10 – 11:42:35.) However, the images from the initial search of the SD card are the primary source of the charges against Defendant. (FTR 11:42:35 – 11:42:50.)

On September 8, 2016, the grand jury in the Southern District of Georgia charged Defendant with one count of enticing a minor to produce child pornography, in violation of 18 U.S.C. § 2251(a); four counts of production of child pornography, in violation of 18 U.S.C. § 2251(a); and one count of possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B). (Doc. no. 4.) On September 28, 2016 Defendant appeared before Magistrate Judge Smith for initial appearance and arraignment. (Doc. no. 23.)

## II. DISCUSSION

### A. There Is No Basis for Suppression of Evidence Related to Officer Cogswell's Initial Search and Seizure of the Cell Phone.

As explained below, the Court finds no basis for suppression of evidence related to the cell phone seizure and searches. Officer Cogswell obtained consent from Defendant to conduct the initial search of the phone. The plain view doctrine authorized Officer Cogswell's warrantless seizure of the phone because evidence he found in plain view during the consent search was immediately recognizable as incriminating evidence that Defendant lied to obstruct officers from determining the location of LP.

### 1. Officer Cogswell Obtained Consent From Defendant to Conduct the Initial Phone Search.

A warrantless search conducted pursuant to valid consent is permissible under the Fourth Amendment. Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973). The Court finds

the officers' testimony that Defendant consented to the initial search of his cell phone more credible than the contrary testimony of Defendant. To understand why, one must first be familiar with the legal context of how courts make credibility determinations.

"Credibility determinations are typically the province of the fact finder because the fact finder personally observes the testimony and is thus in a better position than a reviewing court to assess the credibility of witnesses." United States v. Williams, 731 F.3d 1222, 1230 (11th Cir. 2013) (citation omitted). In making its credibility determination, the Court must take into consideration not only the interests of the witness, but also his or her intelligence, state of mind, candor, and demeanor on the stand. United States v. Ramirez-Chilel, 289 F.3d 744, 749-50 (11th Cir. 2002). A reviewing court must accept the fact finder's credibility determination "'unless it is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable fact finder could accept it.'" Ramirez-Chilel, 289 F.3d at 749 (citation omitted).

Officers Rowan and Cogswell testified in an intelligent, thoughtful, and candid manner, and it was clear to the Court that they presented the facts as thoroughly and accurately as possible. Both officers provided detailed accounts of their interactions with Defendant that were consistent in all material respects. For example, both testified Defendant denied speaking with LP and having any contact with LP since her flight from custody. (FTR 9:57:50 – 9:58:00; 9:34:30 – 9:34:37.)

Both also testified consistently regarding Defendant's consent to search his phone. Officer Cogswell testified he asked Defendant if he could look through his phone to make sure he "hadn't had any contact with LP." (FTR 9:59:17 – 9:59:31.) Officer Rowan similarly testified Officer Cogswell asked Defendant if he could look in his phone to make

sure LP had not "made contact with you." (FTR 9:19:25 – 9:19:40.) Both officers testified Defendant replied by verbally expressing his consent and physically confirming his consent by handing the cell phone to Officer Cogswell. (FTR 9:20:30 – 9:20:56; 10:00:00 – 10:00:36.) Both officers also testified Defendant did not impose any limitations on the scope of the search. (Id.) Both officers testified that, after Officer Cogswell searched the phone, Defendant admitted he had contact with LP since her escape. (FTR 9:39:18 – 9:39:30; 10:04:20 – 10:04:50.)

The officers also candidly admitted when they could not recall events or details. For example, Officer Rowan admitted he did not recall the exact words used by Officer Cogswell when he asked for the phone. (FTR 9:39:30 – 9:40:30.) Officer Rowan conceded that Officer Cogswell told Defendant he would return the cell phone, and Officer Rowan admitted not recalling whether he told Defendant he would return the phone. (FTR 9:40:50 – 9:41:02.) Officer Cogswell conceded that, during his initial search of the cell phone, he could not discern whether the nude images were of LP, and he also candidly admitted Defendant did not consent to the seizure of his phone. (FTR 10:03:10 – 10:03:22; 10:19:07 – 10:19:20.)

Bolstering both officers' credibility concerning the issue of consent is the testimony of Officer Prince. He testified Defendant called him on January 11, 2016, the same day as the initial cell phone search and seizure, and admitted he consented to Officer Cogswell searching the phone because he wanted to help locate LP and avoid any trouble from law enforcement. (FTR 10:32:10 – 10:32:45.)

Far less credible is Defendant's untested and conclusory affidavit statements. (Ex. D, p. 2.) Defendant claims that, after he met with officers outside apartment 117 and told the

officers he did not know where LP was, Officer Cogswell "told the other officers to search the apartment." (Id. ¶ 3.) While this conclusory statement suggests Officer Cogswell simply told the other officers to search the apartment without first obtaining consent, Ms. Manker and Officer Rowan both testified that Officer Rowan asked for, and Ms. Manker gave, consent. (FTR 9:19:40 – 9:19:52; 9:22:30 – 9:22:50; 11:59:20 – 11:59:45.)

The Court also finds Defendant not trustworthy because of the undisputed testimony that he lied to law enforcement at least three times. First, on October 14, 2015, Defendant told law enforcement LP was not inside his apartment when she was hiding in a closet in the apartment. (FTR 11:15:10 – 11:15:25.) Second, when law enforcement found LP in the closet, Defendant lied and told law enforcement LP's name was Jessica. (FTR 11:15:37 – 11:16:05.) Finally, on January 11, 2016, Defendant denied any contact with LP, but later admitted this was a lie when Officer Cogswell discovered the text messages. (FTR 9:39:18 – 9:39:30.)

Finally, it is unlikely Officer Cogswell grabbed and searched Defendant's phone without Defendant's consent because Defendant admitted he voluntarily complied with Officer Cogswell's subsequent request to send LP a text message asking if she was okay. (Ex. D, p. 1.) This act of complete cooperation is much more consistent with Defendant's admission to Officer Prince, and with the hearing testimony of Officers Cogswell and Rowan, that Defendant cooperated fully by voluntarily giving his phone to Officer Cogswell and texting LP to help the officers locate her. As Defendant told Officer Prince, he cooperated fully with the officers because he did not want any trouble. (FTR 10:32:10 – 10:32:45.)

The Court does not find the vague testimony of Ms. Manker to be directly relevant or credible. Ms. Manker did not witness the cell phone transfer from Defendant to the officers, and thus cannot say whether Defendant voluntarily gave the phone to Officer Cogswell. (FTR 12:00:07 – 12:00:36.) She also does not know whether the officers and Defendant had a conversation before entering the apartment. (See FTR 12:00:40 – 12:00:55.) Ms. Manker confessed that, at the time of these events, she was smoking marijuana with Defendant and a friend in the apartment. (FTR 12:01:20 – 12:02:02.) Her testimony is also contrary to the undisputed fact the officers did not arrest Defendant on January 11, 2016. Defendant never mentions being arrested or handcuffed on this occasion. (See Ex. D.) The officers do not either.

The Court finds Defendant's affidavit and Ms. Manker's testimony to be no match for the detailed, consistent, and earnest testimony of the officers at the hearing on both direct and cross examination. Crediting the officers' testimony fully, the Court finds Defendant consented to a search by Officer Cogswell of his cell phone on January 11, 2016, for the purpose of determining whether Defendant lied when he denied any contact with LP.

## 2.     Defendant's Consent was Freely and Voluntarily Given.

The government bears the burden of proving consent was freely and voluntarily given, meaning it was the product of a free and unconstrained choice. United States v. Boulette, 265 F. App'x 895, 898 (11th Cir. 2008). "The standard for measuring the scope of . . . consent . . . is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the [individual giving the consent]?" Florida v. Jimeno, 500 U.S. 248, 251 (1991).

In determining voluntariness, courts consider: (1) the defendant's custodial status; (2) the presence of any coercive police procedure; (3) the extent and level of the defendant's cooperation; (4) the defendant's awareness of his right to refuse to consent to the search; (5) the defendant's education and intelligence; and (6) any belief by the defendant that no incriminating evidence will be found. United States v. Chemaly, 741 F.2d 1346, 1352 (11th Cir. 1984), opinion reinstated on reh'g sub nom. United States v. Bacca-Beltran, 764 F.2d 747 (11th Cir. 1985). No single factor is dispositive because voluntariness must be determined from the totality of the circumstances. Id.

Here, based on the totality of the circumstances, the Court finds Defendant's consent to the initial search of his phone was freely and voluntarily given. Defendant concedes he voluntarily exited apartment 117 and sought out the officers when his grandfather said they were looking for him. (Ex. D, p. 1, ¶ 2.) Their interaction outside of apartment 117 was cordial, with the officers explaining that LP was missing and asking whether Defendant had any recent contact with her. (FTR 9:59:17 – 9:59:31.) When Defendant denied any contact, the officers asked to see his phone to confirm his statements, and Defendant complied without voicing any concerns or objections. (FTR 10:00:00 – 10:00:36; 9:20:30 – 9:20:56; 9:22:50 – 9:23:00.)

Defendant does not contend he was coerced or intimidated. During the entire exchange, the officers never drew their weapons or made any physical contact with Defendant. Defendant was never arrested or handcuffed. As Defendant admits, he cooperated when asked by Officer Cogswell to send LP a text message asking LP if she was okay. Although the officers did not inform Defendant of his right to refuse consent, this does not invalidate Defendant's validly given consent. See United States v. Taylor, 458 F.3d

1201, 1205 (11th Cir. 2006) (finding defendant freely consented to search of area around barn in case where defendant was not told he could refuse consent).

Accordingly, based on the totality of the circumstances, the Court finds Defendant's consent to the initial search of his phone was voluntary and freely given. Indeed, there was no show of force or attempt to coerce Defendant's consent, and the context of his consent pales in comparison to far more concerning contexts where courts still found consent to be voluntary and freely given. See United States v. Telcy, 362 F. App'x 83, 86-87 (11th Cir. 2010) (finding consent voluntary where defendant was in handcuffs and in custody because officers did not employ any coercive tactics); United States v. Hidalgo, 7 F.3d 1566, 1570-71 (11th Cir. 1993) (finding consent to search voluntary even when SWAT members charged into home and forced defendant to ground at gunpoint); United States v. Garcia, 890 F.2d 355 (11th Cir. 1989) (finding arrestee's consent to search home voluntary despite fourteen agents in home and arrestee being handcuffed).

### 3. Officer Cogswell's Initial Search of the Cell Phone Did Not Exceed Defendant's Scope of Consent.

Consensual searches are limited to the terms of their authorization. United States v. Susini, 261 F. App'x 270, 273 (11th Cir. 2008). "When an individual gives a general statement of consent without express limitations, the scope of a permissible search is not limitless." United States v. Martinez, 949 F.2d 1117, 1119 (11th Cir. 1992). The search will still be constrained by the bounds of reasonableness, specifically what the officer could reasonably interpret the consent to encompass. Id. "To ascertain what conduct is within the 'bounds of reasonableness,' we must consider what the parties knew to be the object (or objects) of the search." United States v. Zapata, 180 F.3d 1237, 1242 (11th Cir. 1999). "The

person who gave consent can also limit the scope of a search as it is occurring, or request that it be discontinued." United States v. Garcia, 284 F. App'x 791, 795 (11th Cir. 2008).

Here, Officer Cogswell asked Defendant if he could search the phone for evidence of contact between Defendant and LP after Defendant initially denied any contact. (FTR 9:59:17 – 9:59:31.) Defendant did not place any limitations on the extent of the search, and handed the phone to Officer Cogswell. (FTR 9:22:50 – 9:23:00.) Officer Cogswell searched the phone log and found Defendant called LP on January 10, 2016, one day earlier, and Officer Cogswell also searched text messages and found multiple, recent messages between Defendant and LP. (FTR 10:03:45 – 10:04:05; 10:02:30 – 10:03:10.) Here, a reasonable officer would have understood Defendant's consent naturally encompassed any area of the cell phone that might contain evidence of contact or communications between them, including e-mails, text messages, and phone calls. Accordingly, the Court finds Officer Cogswell did not exceed the scope of Defendant's consent and acted reasonably in searching Defendant's phone for any contact with LP.

Defendant argues Officer Cogswell's discovery of nude images exceeded the scope of Defendant's consent. (Doc. no. 39, p. 8.) However, photos are evidence of contact between people, and a reasonable person in Officer Cogswell's position would have understood the scope of consent to include any part of the phone. Furthermore, Defendant did not prohibit Officer Cogswell from searching through the images on his phone, despite ample opportunity to limit the scope of the search or request that it be discontinued. See United States v. Harris, 928 F.2d 1113, 1118 (11th Cir. 1991) (finding it significant defendant did not limit scope of search or request it be discontinued while officers searched car for drugs); United States v. Jaramillo, No. 1:13-cr-00308-JEC-RGV, 2014 U.S. Dist. LEXIS 91027, at & 41-42 n. 25

(N.D. Ga. Apr. 25, 2014) (finding officers did not exceed scope of consent search by searching locked luggage where defendant unlocked luggage and did not attempt to revoke or limit consent).

Regardless, it is notable that the nude images did not influence Officer Cogswell's decision to seize the phone because Officer Cogswell did not know at the time whether the nude images were child pornography. (FTR 10:03:10 – 10:03:22.) Instead, Officer Cogswell seized the phone because the text messages and phone log revealed Defendant lied concerning his recent contact with LP. (FTR 10:16:15 – 10:16:55.)

**B.** **The Warrantless Seizure of Defendant's Cell Phone Is Permissible Under the Plain View Doctrine.**

While a search compromises an individual's interest in privacy, a seizure deprives an individual of dominion over his person or property. Horton v. California, 456 U.S. 128, 133 (1990). Simply because an item may be searched pursuant to consent does not necessarily follow that the item may be seized without a warrant. See Soldal v. Cook Cty., Ill., 506 U.S. 56, 62 (1992). There are a number of exceptions to the Fourth Amendment that would authorize an officer to seize an item while conducting a warrantless search, such as consent, plain view, or exigent circumstances. See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (finding consent allows for seizure without warrant or probable cause); United States v. Smith, 459 F.3d 1276, 1290 (11th Cir. 2006) (allowing seizure of contraband without warrant because of plain view doctrine); United States v. Santa, 236 F.3d 662, 669 (11th Cir. 2000) (finding exigent circumstances allowed for warrantless seizure); see also United States v. Chappell, No. 1:10-CR-531-WSD-ECS, 2011 WL 5352947, at *5 (N.D. Ga. Nov. 4, 2011) ("There are, however, a number of exceptions to the Fourth Amendment that would

authorize an officer to seize an item while conducting a search without a warrant, such as consent, plain view, or exigent circumstances.").

"The 'plain view' doctrine permits a warrantless seizure where (1) an officer is lawfully located in the place from which the seized object could be plainly viewed and must have a lawful right of access to the object itself; and (2) the incriminating character of the item is immediately apparent." Smith, 459 F.3d at 1290. Before a seizure is authorized under the plain view doctrine, officers must have probable cause to believe the item is contraband. Id. A warrantless seizure under the plain view doctrine cannot be justified unless the incriminating nature of the item is immediately apparent. Id.

Courts apply the plain view doctrine where, as here, a consent search of a computer or cell phone reveals incriminating evidence that is in plain view during the search. In United States v. Whaley, the defendant had given permission for a police officer to click on desktop icons on a laptop for the purpose of locating a flight simulator. 415 F. App'x 129, 134 (11th Cir. 2011). Clicking on an icon that, when opened, displayed child pornography, the officer seized the laptop without a warrant. The Eleventh Circuit first explained the officer accessed the child pornography through a consent search of the laptop. The Eleventh Circuit then reasoned, more importantly, that once the officer clicked on the icon, "the child pornography was in plain view," and, "[a]t that point, the officers had probable cause to seize the computer for further investigation." Id.

Here, Defendant voluntarily consented to Officer Cogswell's search of his cell phone to determine if Defendant was telling the truth when he denied any recent contact with LP. Defendant's phone log and text message exchange with LP were in plain view during this search, and this incriminating evidence of Defendant obstructing justice and lying to police

officers provided Officer Cogswell with probable cause to seize the cell phone for further investigation. Indeed, the text messages and phone log revealed Defendant had been in contact with LP after her flight from home confinement two days earlier, which proved Defendant lied when he told Officer Cogswell he had no recent contact with LP. (Gov't. Exs. 3, 4; FTR 10:02:30 – 10:03:10; 10:03:45 – 10:04:05.) The search also uncovered incriminating messages from Defendant four hours earlier telling LP to "stay low," with LP replying they should "stop talking" lest there be a wiretap. (Id.)

These facts, like those in <u>Whaley</u>, fit well within the plain view doctrine and provided a sufficient constitutional basis for Officer Cogswell to seize the cell phone without a warrant. <u>See</u> <u>United States v. Rodriguez-Gomez</u>, No. 1:10-CR-103-2-CAP, 2010 WL 5524891, at *3 (N.D. Ga. Nov. 15, 2010), <u>report and recommendation adopted in part</u>, No. 1:10-CR-103-2-CAP, 2011 WL 39003 (N.D. Ga. Jan. 4, 2011) (holding warrantless seizure of incriminating photographs on defendant's cell phone justified under plain view doctrine because photographs came into plain view when officer conducted consent search of phone for telephone number); <u>see also</u> <u>United States v. Highbarger</u>, 380 F. App'x 127, 131 (3d Cir. 2010) (holding officers properly seized child pornography found during warrant search of computer for evidence of drug trafficking because once agent "opened the graphic file that contained the image of child pornography, he was entitled to seize that image under the plain view doctrine").

### C. The Search of Defendant's Cell Phone SD Card by Parole Officer Prince Was Not a Violation of Defendant's Constitutional Rights.

Defendant argues the warrantless search of his cell phone SD card by Officer Prince was unconstitutional in the absence of a warrant or reasonable suspicion of criminal

activity.  (Doc. no. 39, pp. 9-18.)  The argument runs counter to Samson v. California, 547 U.S. 843 (2006) and its Eleventh Circuit progeny.

In Samson, the Supreme Court found no Fourth Amendment violation in the warrantless, suspicionless search of a California parolee, reasoning parolees have fewer privacy expectations than ordinary citizens.  547 U.S. at 850.  As a condition of parole, the petitioner in Samson agreed in writing "to be subject to search or seizure by a parole officer or other peace officer at any time of the day or night with or without a search warrant and with or without cause."  Id. at 852.  Because acceptance of this condition diminished the petitioner's reasonable expectation of privacy, and parole is more akin to imprisonment than probation, the Fourth Amendment did not prohibit a warrantless, suspicionless search. Id. at 857.

In United States v. Stewart, 213 F. App'x 898, 899 (11th Cir. 2007), the petitioner argued that, although his parole conditions authorized warrantless searches under Samson, the Fourth Amendment still required reasonable suspicion of criminal activity for a search of a parolee.  The Eleventh Circuit disagreed, reasoning that because the petitioner's parole certificate "required him to submit to a search 'at any time' without a warrant, the search was authorized by the terms of [the petitioner's] parole conditions."  Id.   In United States v. Johnson, the Eleventh Circuit reiterated parole officers do not need reasonable suspicion for a warrantless search of a parolee who signed a parole certificate authorizing warrantless searches at any time.  579 F. App'x 920, 926 (11th Cir. 2014).

Here, as a condition of his parole, Defendant agreed a "parole officer . . . may, at any time, conduct a warrantless search of [Defendant's] person, papers, and place of residence, automobile, or any other property under [Defendant's] control."  (Ex. G, p. 2.)   These

unambiguous conditions authorized Defendant's parole officer, Mr. Prince, to conduct a warrantless, suspicionless search of the cell phone SD card.  See Johnson, 579 F. App'x at 926; Stewart, 213 F. App'x at 899.  Accordingly, the warrantless search of the cell phone SD card was not a violation of Defendant's Fourth Amendment rights, and all evidence obtained, including numerous images of child pornography, are not subject to suppression.

Defendant argues Officer Prince is now a "Community Supervision Officer" rather than a parole officer, and Defendant's parole conditions only authorized warrantless searches by "parole officers."  (Doc. no. 39, p. 15.)  Effective July 1, 2015, statutory amendments replaced the Georgia State Board of Pardons and Paroles with the Board of Community Supervision.  O.C.G.A. § 42-3-2.  The amendments transfer all powers, functions, and duties of the Board of Pardons and Paroles to the Board of Community Supervision.  While it is true that all Georgia probation and parole officers are now referred to generally as "Community Supervision Officers," this change in nomenclature does not change Officer Prince's functional role as Defendant's parole officer, nor does it negate Defendant's written consent to warrantless searches by his parole officer.

Defendant also argues the evidence from the search of his cell phone's SD card should be suppressed because Officer Prince conducted the search in violation of applicable parole department policies.   (Doc. no. 39, p. 15.)  The Georgia Board of Pardons and Paroles Policy Statement provides, in pertinent part, as follows:

> The search of a parolee's "person, papers, place of residence, automobile or any other property" should be conducted only after "reasonable suspicion" have [sic] been established. Examples of a reasonable suspicion issue could be a positive urine screen from a parolee, erratic behavior by the parolee, a lost job or information received from a family member indicating drug use, potential criminal behavior or parole

violations . . . warrantless searches should be conducted in an orderly manner and under the supervision and control of parole officers.

(Doc. no. 39-8, "Ex. H," p. 3.)    The Department of Community Supervision Policy & Procedure Statement, provides, in pertinent part, as follows:

> The search of any parolee's "persons, papers, place of residence, automobile or any other property" should be conducted only after "reasonable suspicion" has been established and permission from the supervisor is obtained.    Examples of a reasonable suspicion issue could be a positive urine screen from a parolee, erratic behavior by the parolee, a lost job, or information received from a family member indicating drug use, potential criminal behavior, or parole violations . . . warrantless searches should be conducted in an orderly manner and under the supervision of sworn staff.

(Doc. no. 39-9, "Ex. I," p. 3.)

Defendant argues Officer Prince did not abide by these policies because he did not have reasonable suspicion for the search or permission from a supervisor.  (Doc. no. 39, p. 15.)  Defendant also suggests Officer Prince violated these policies by allowing FBI agents to conduct an independent search of the device.  (Id.)    The arguments fail for at least three reasons.

First, the violation of parole department guidelines or policies does not rise to the level of a constitutional violation requiring suppression of evidence.  The Northern District of Georgia so held four years ago in United States v. Wade, No. 1:11-CR-0337-WBH-CCH, 2012 WL 279431, at *6 n.2 (N.D. Ga. Jan. 4, 2012), report and recommendation adopted, No. 1:11-CR-0337-WBH, 2012 WL 292624 (N.D. Ga. Jan. 31, 2012), aff'd, 551 F. App'x 546 (11th Cir. 2014).  The defendant moved to suppress evidence from a parole search of his home, arguing in part that the parole officer violated the reasonable suspicion requirement set

forth in the Field Operations Manual for the State of Georgia Board of Pardons and Paroles. Applying Samson and Stewart, the court first concluded reasonable suspicion was not required for a warrantless search because the defendant signed a parole certificate authorizing warrantless searches at any time. The court then rejected the secondary argument based on the reasonable suspicion requirement in the policy manual, reasoning "that a violation of the State of Georgia's operating procedures for searching a parolee may give rise to disciplinary action against the offending officers, but unlike a violation of a Constitutional right guaranteed under the Fourth Amendment, however, the fruits of the offending search need not necessarily be suppressed." Id. This Court agrees.

Second, Officer Prince did not violate department policy because he had ample information to form a reasonable suspicion of criminal conduct by the time of the cell phone SD card search on January 12, 2016. (See doc. no. 39, p. 14.) "Reasonable suspicion consists of 'a sufficiently high probability that the criminal conduct is occurring to make the intrusion on the individual's privacy interest reasonable.'" United States v. Yuknavich, 419 F.3d 1302, 1311 (11th Cir. 2005). A reasonable suspicion determination requires examining the totality of the circumstances to determine whether the officer has a particularized and objective basis for suspecting legal wrongdoing. Id. Whether reasonable suspicion existed is an objective test, and an officer's subjective intentions or beliefs are immaterial. United States v. Robinson, 515 F. App'x 790, 791 (11th Cir. 2013).

Prior to conducting the search on January 12, 2016, Officer Prince knew the female informant accused Defendant of physically abusing LP, having sexual relations with LP, and trafficking LP for prostitution. (FTR 10:29:34 – 10:29:57.) He was also aware officers found LP in Defendant's bedroom closet on October 14, 2015, and Defendant lied to officers

and denied her presence there until they found her, at which time Defendant lied about her name. (FTR 10:31:05 – 10:31:20.) Finally, just before conducting the cell phone search on January 12, 2016, Officer Prince learned from Agent Meade about the troubling events of the day before, when Defendant denied any contact with LP until Officer Cogswell found definitive proof to the contrary on his cell phone, along with nude images of young females who could be underage. (FTR 10:48:50 – 10:49:15.) Viewing the totality of circumstances, Officer Prince's suspicion was reasonable.

Finally, Defendant misconstrues the facts by arguing Agent Meade used Officer Prince's parole authority to evade the warrant requirement. On the contrary, Officer Prince testified unequivocally he wanted to conduct the search because of the troubling information about his parolee's involvement with LP. Officer Prince utilized the FBI to search the phone solely because the phone was turned off when Officer Prince received it, and his office lacked the technological capabilities to search the phone. (FTR 10:33:42 – 10:33:47; 11:40:35 – 11:40:40.) Officer Prince directed the search of the SD card at the FBI office in Savannah. (FTR 10:34:31 – 10:34:58.) The mere presence of Agent Meade does not invalidate the search. See United States v. Wilcher, No. 1:10-CR-25-TWT-LTW, 2010 WL 5678676, at *6 (N.D. Ga. Dec. 17, 2010), report and recommendation adopted, No. 1:10-CR-25-TWT, 2011 WL 336462 (N.D. Ga. Feb. 1, 2011) (finding presence of special agent did not invalidate search by parole officers).

For all these reasons, Officer Prince's warrantless search of the cell phone's SD card was permissible and did not violate the Fourth Amendment.

**D.     The Search Warrant Delay Was Reasonable.**

Defendant argues the twenty-eight day delay between the seizure of his cell phone and issuance of the search warrant violated his Fourth Amendment rights.  (Doc. no. 42.) "[A] seizure lawful at its inception can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on unreasonable searches."  United States v. Mitchell, 565 F.3d 1347, 1350 (11th Cir. 2009) (quoting United States v. Jacobsen, 466 U.S. 109, 124 (1984)). The reasonableness of the delay is determined in light of all the facts and circumstances, and on a case-by-case basis.  Id. (quotations omitted).  The reasonableness determination reflects a careful balancing of governmental and private interests.  Id.  (citing Soldal v. Cook County, 506 U.S. 56, 71 (1992)).

Here, the government has demonstrated compelling justification for the delay in seeking and obtaining the search warrant.  Agent Meade was the only Savannah FBI agent assigned to child trafficking cases, and she was thus the only agent involved in the investigation of Defendant.  (FTR 11:44:30 – 11:45:04.)  During the period of delay in question, Agent Meade was also the only agent working on another new child trafficking case involving eight minors.  (FTR 11:44:30 – 11:45:04.)  This second case demanded immediate attention and took priority over preparation of the warrant application for Defendant's cell phone because numerous minors involved in the sex trafficking ring were missing and needed to be located.  (FTR 11:45:40 – 11:45:50.)  Despite the urgency of this second case, Agent Meade testified to diligently working with AUSA Groover on preparing the search warrant affidavit between the dates of January 13 and submission of the application to the Magistrate Judge on February 8.  During this time period, Agent Meade

reviewed her case file, prepared the affidavit, exchanged drafts with AUSA Groover, and tracked down additional pieces of information AUSA Groover requested. (FTR 11:48:48 – 11:49:31.) In light of these circumstances, the delay in presenting the warrant application is reasonable.

This case is distinguishable from Mitchell, in which the Eleventh Circuit held a twenty-one day delay in obtaining a warrant to search a hard drive seized from a home computer was unreasonable under the circumstances. 565 F.3d at 1352. The agent in Mitchell attended a two-week training program which he could have delayed, and postponed applying for a warrant because he "felt there was no need to get a search warrant . . . until [he] returned." Id. The agent did nothing to prepare the warrant during the two and one-half days between the seizure of the hard drive and his departure for the training program. Furthermore, no evidence suggested the agent was unable to delay the training, or alternately assign the search warrant task to another agent involved in this nationwide investigation. Id. In sum, the Eleventh Circuit found "[n]o effort was made to obtain a warrant within a reasonable time because law enforcement officers simply believed that there was no rush." Id. at 1353.

Here, the delay relates primarily to another child trafficking case taking priority because of the pressing need to find missing child victims. The Court cannot imagine anything more deserving of immediate attention by a federal agent than missing children, and the four-week delay in Defendant regaining possession of his cell phone pales in comparison. The Court finds the delay was reasonable in light of the facts and circumstances. Indeed, the Eleventh Circuit recognized in Mitchell that a delay may be justifiable "if some overriding circumstance arose, necessitating the division of law enforcement personnel to another case."

Id. at 1352-53. The Eleventh Circuit applied this reasoning in United States v. Vallimont, 378 F. App'x 972, 976 (11th Cir. 2010), holding that a forty-five day delay in obtaining a search warrant was reasonable because overriding circumstances necessitated diversion of the investigating agent to another case.

      **E.**      **The Court Suppresses Defendant's Custodial Disclosure of His Cell Phone Swipe Code, But The Contents of the Cell Phone are Not Suppressible Because the Government Would Have Inevitably Bypassed the Swipe Code and Accessed the Phone.**

The government concedes that, because Defendant was in custody but not Mirandized when asked on January 13, 2016 to enter his swipe pattern to unlock his phone, suppression of the fact that Defendant disclosed the swipe pattern is required. (FTR 12:14:01 – 12:14:25.) However, the contents of the cell phone accessed by officers entering the swipe pattern is not subject to suppression under the inevitable discovery doctrine. Improperly seized evidence may be admitted if "the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." Nix v. Williams, 467 U.S. 431, 443 (1984). "Under the rationale underlying the exclusionary rule and its exceptions, the prosecution is not to be put in a better or worse position than it would have been if no illegality had occurred." United States v. Freeman, 591 F. App'x 855, 861 (11th Cir. 2014).

Here, as Agent Meade testified, FBI offices in Savannah and Quantico, Virginia both had the technological capabilities to bypass the swipe pattern and access the contents of Defendant's cell phone. (FTR 11:40:35 – 11:40:40.) Thus, regardless of whether officers violated Defendant's Miranda rights in obtaining Defendant's swipe pattern, the inevitable discovery doctrine prevents suppression of the evidence attained from the cell phone search.

See United States v. Ashmore, No. 2:16-CR-20016, doc. no. 36, p. 11 (W.D. Ark. May 11, 2016) (finding evidence from cell phone admissible under doctrine even though officers obtained password from defendant in violation of Miranda because law enforcement could bypass password and view cell phone contents); United States v. Will, No. 5:15-CR-6, 2015 WL 3822599, at *16 (N.D. W. Va. June 19, 2015) (applying doctrine to deny motion to suppress alleging violation of Miranda rights in officers obtaining cell phone password from defendant, finding officers possessed technology to access phone contents without password).

### F. Defendant's Statements at Chatham County Jail on January 13, 2016, and February 16, 2016, Are Subject to Suppression.

Defendant also seeks the suppression of his statements to Officer Prince while detained at the Chatham County Jail on January 13, 2016, and on February 16, 2016. (Doc. no. 39, pp. 19-22.) On January 13, 2016, the day of his arrest, Defendant responded to a question about contraband by admitting he possessed a small amount of marijuana in his right shoe. On February 16, 2016, Defendant discussed the allegations of parole violations with Officer Prince and signed a form admitting he violated the terms of his release. Defendant seeks suppression of all these custodial statements because Defendant was not Mirandized prior to any of them. The government has not responded to this specific aspect of the suppression motion, but has conceded in general that custodial statements made by Defendant in the absence of Miranda warnings are generally inadmissible.

"The Fifth Amendment, in relevant part, provides that no person 'shall be compelled in any criminal case to be a witness against himself.'" Minnesota v. Murphy, 465 U.S. 420, 426 (1984). This prohibition applies in criminal trials as well as in any other proceeding,

"criminal or civil, formal or informal, where the answers might incriminate him in future criminal proceedings." Id. (citing Leftkowitz v. Turley, 414 U.S. 70, 77 (1973)). "A defendant does not lose this protection by reason of his conviction of a crime; notwithstanding that a defendant is imprisoned or on probation at the time he makes incriminating statements, if those statements are compelled they are inadmissible in a subsequent trial for a crime other than that for which he has been convicted." Id.; United States v. Fisher, No. CR-06-152 NEJL, 2007 WL 625424, at *4 (D. Idaho Feb. 23, 2007) ("A defendant does not lose his Fifth Amendment protections if he is on probation or supervised release.").

Here, Defendant was in custody and was entitled to Miranda warnings prior to any interrogation by Officer Prince on January 13, 2016, and February 16, 2016. See Murphy, 465 U.S. at 426. The government and Officer Prince concede Defendant was never Mirandized at any point during his interactions with Officer Prince at the Chatham County jail on either date. (FTR 12:14:01 – 12:14:25.) Accordingly, Defendant's custodial statements are subject to suppression. See Miranda v. Arizona, 384 U.S. 436, 479 (1966).

## III.   CONCLUSION

For the reasons set forth above, the Court **REPORTS** and **RECOMMENDS** Defendant's motion to suppress be **GRANTED** as to suppression of post-arrest statements and **DENIED** as to suppression of evidence from the search and seizure of the cell phone.

(Doc. nos. 39, 42.)  All related motions should be **DENIED** as moot.  (Doc. nos. 28, 34.)

SO REPORTED and RECOMMENDED this 10th day of February, 2017, at Augusta, Georgia.

BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA